**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PNEU-DART, INC., | No. 4:20-CV-00497 |
| Plaintiff, | (Judge Brann) |
| v. | |
| GENERAL STAR INDEMNITY COMPANY, | |
| Defendant. | |

**MEMORANDUM OPINION**

**JULY 16, 2020**

## I.    BACKGROUND

On May 15, 2020, Defendant General Star Indemnity Company filed an Amended Counterclaim against Plaintiff Pneu-Dart, Inc.[1]  Pneu-Dart moves to dismiss General Star's Amended Counterclaim for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).[2]  The Court denies Pneu-Dart's motion.

## II.    DISCUSSION

### A.    Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), the Court dismisses a complaint, in whole or in part, if the plaintiff has failed to "state a claim upon

---

[1]    *See* Doc. 15 at 11-26.
[2]    *See* Doc. 16.

which relief can be granted."  A motion to dismiss "tests the legal sufficiency of a pleading"[3] and "streamlines litigation by dispensing with needless discovery and factfinding."[4]  "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."[5]  This is true of any claim, "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one."[6]

Following the Roberts Court's "civil procedure revival,"[7] the landmark decisions of *Bell Atlantic Corporation v. Twombly*[8] and *Ashcroft v. Iqbal*[9] tightened the standard that district courts must apply to 12(b)(6) motions.  These cases "retired" the lenient "no-set-of-facts test" set forth in *Conley v. Gibson* and replaced it with a more exacting "plausibility" standard.[10]

Accordingly, after *Twombly* and *Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[11]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

---

[3]   *Richardson v. Bledsoe*, 829 F.3d 273, 289 n.13 (3d Cir. 2016) (Smith, C.J.) (*citing Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001) (Easterbrook, J.).

[4]   *Neitzke v. Williams,* 490 U.S. 319, 326-27 (1989).

[5]   *Neitzke*, 490 U.S. at 326 (*citing Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

[6]   *Neitzke*, 490 U.S. at 327.

[7]   Howard M. Wasserman, *The Roberts Court and the Civil Procedure Revival*, 31 Rev. Litig. 313, 316, 319-20 (2012).

[8]   550 U.S. 544 (2007).

[9]   556 U.S. 662, 678 (2009).

[10]  *Iqbal*, 556 U.S. at 670 (*citing Conley v. Gibson*, 355 U.S. 41 (1957)) ("[a]cknowledging that *Twombly* retired the *Conley* no-set-of-facts test").

[11]  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

inference that the defendant is liable for the misconduct alleged."[12]  "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."[13]  Moreover, "[a]sking for plausible grounds . . . calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [wrongdoing]."[14]

The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[15]  No matter the context, however, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[16]

When disposing of a motion to dismiss, the Court "accept[s] as true all factual allegations in the complaint and draw[s] all inferences from the facts alleged in the light most favorable to [the plaintiff]."[17]  However, "the tenet that a court must accept as true all of the allegations contained in the complaint is

---

[12]  *Iqbal*, 556 U.S. at 678.
[13]  *Connelly v. Lane Const. Corp.*, 809 F.3d 780 (3d Cir. 2016) (Jordan, J.) (internal quotations and citations omitted).
[14]  *Twombly*, 550 U.S. at 556.
[15]  *Iqbal*, 556 U.S. at 679.
[16]  *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 557 (internal quotations omitted)).
[17]  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (Nygaard, J.).

inapplicable to legal conclusions."[18]  "Threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice."[19]

As a matter of procedure, the United States Court of Appeals for the Third

Circuit has instructed that:

> Under the pleading regime established by *Twombly* and *Iqbal*, a court
> reviewing the sufficiency of a complaint must take three steps.  First, it
> must tak[e] note of the elements [the] plaintiff must plead to state a
> claim.  Second, it should identify allegations that, because they are no
> more than conclusions, are not entitled to the assumption of truth.
> Finally, [w]hen there are well-pleaded factual allegations, [the] court
> should assume their veracity and then determine whether they plausibly
> give rise to an entitlement to relief.[20]

### B.    Facts Alleged in the Amended Counterclaim

The facts alleged in General Star's Amended Counterclaim, which I must

accept as true for the purposes of this motion, are as follows.

### 1.    The Product Withdrawal Endorsement

General Star issued Commercial Lines Policy No. IYG418987 to Pneu-Dart

for the policy period May 19, 2014 to May 19, 2015 (the "14-15 Policy").  Subject

to its terms and conditions, the 14-15 Policy has a $2 million General Aggregate

Limit and a $1 million Each Occurrence Limit.[21]

---

[18]   *Iqbal*, 556 U.S. at 678 (internal citations omitted); *see also Fowler v. UPMC Shadyside*, 578
F.3d 203, 210 (3d Cir. 2009) (Nygaard, J.) ("After *Iqbal*, it is clear that conclusory or 'bare-
bones' allegations will no longer survive a motion to dismiss.").
[19]   *Iqbal*, 556 U.S. at 678.
[20]   *Connelly*, 809 F.3d at 787 (internal quotations and citations omitted).
[21]   Doc. 15 at ¶ 6.

General Star also issued Commercial Lines Policy No. IYG418987A to Pneu-Dart for the policy period May 19, 2015 to May 19, 2016 (the "15-16 Policy").  Subject to its terms and conditions, the 15-16 Policy has a $2 million General Aggregate Limit and a $1 million Each Occurrence Limit.[22]

Each policy contains an endorsement titled "Limited Product Withdrawal Expense Endorsement" (the "Product Withdrawal Endorsement").  The Product Withdrawal Endorsement contained in each policy is identical.[23]  Each Product Withdrawal Endorsement has a $100,000 Aggregate Limit and a $2,500 Deductible Amount Per Product Withdrawal.[24]  The insuring agreement of the endorsement states:[25]

### SECTION I – LIMITED PRODUCT WITHDRAWAL EXPENSE COVERAGE

1.   **Insuring Agreement**

   a.  We will reimburse you for "product withdrawal expenses" incurred by you because of a "product withdrawal" to which this insurance applies.

   The amount of such reimbursement is limited as described in Section III – Limits Of Insurance. No other obligation or liability to pay sums or perform acts or services is covered.

   b.  This insurance applies to a "product withdrawal" only if the "product withdrawal" is initiated in the "coverage territory" during the policy period because:

---

[22]   Doc. 15 at ¶ 7.
[23]   Doc. 15 at ¶ 8.
[24]   Doc. 15 at ¶ 9.
[25]   Doc. 15 at ¶ 10.

1) You determine that the "product withdrawal" is necessary; or

2) An authorized government entity has ordered you to conduct a "product withdrawal."

c. We will reimburse "product withdrawal expenses" only if:

1) The expenses are incurred within one year of the date the "product withdrawal" was initiated;

2) The expenses are reported to use within one year of the date the expenses are incurred; and

3) The product that is the subject of the "product withdrawal" was produced after the Cut-Off Date designated in the Schedule.

d. The initiation of a "product withdrawal" will be deemed to have been made only at the earliest of the following times:

1) When you first announced, in any manner, to the general public, your vendors or to your employees (other than those employees directly involved in making the determination) your decision to conduct or participate in a "product withdrawal". This applies regardless of whether the determination to conduct a "product withdrawal" is made by you or is requested by a third party; or

2) When you first received, either orally or in writing, notification of an order from any authorized government entity to conduct a "product withdrawal";

e. "Product withdrawal expenses" incurred to withdraw "your products" which contain the same or substantially similar "defect" will be deemed to have arisen out of the same "product withdrawal." A different "defect" will be deemed to have arisen out of a separate "product withdrawal" if newly determined or ordered in accordance with Paragraph 1.b of this endorsement. Otherwise, it will be deemed to have arisen out of the same "product withdrawal."

f. With respect to products of which "your product" is a component part, we will only reimburse you the amount to replace, repair or repurchase "your product."

* * * *

The agreement defines "product withdrawal" as "the recall or withdrawal" "[f]rom the market" or "[f]rom use by any other person or organization" of "'your products,' or products which contain 'your products,' because of a known or suspected 'defect' in 'your product,' or a known or suspected 'product tampering,' which has caused or is reasonably expected to cause 'bodily injury' or physical injury to tangible property other than 'your product.'" The agreement also specifies that "electronic data is not tangible property."[26]

"Defect" is defined as "a defect, deficiency or inadequacy that creates a dangerous condition."[27] "Product tampering" is defined as "an act of intentional alteration of 'your product' which may cause or has caused 'bodily injury' or physical injury to tangible property other than 'your product.'"[28] "Product withdrawal expenses" means those reasonable and necessary extra expenses, listed below, paid and directly related to a "product withdrawal":[29]

    a.  Costs of notification;

    b.  Costs of stationery, envelopes, production of announcements and postage or facsimiles;

    c.  Costs of overtime paid to your regular non-salaried employees and costs incurred by your employees, including costs of transportation and accommodations;

---

[26] Doc. 15 at ¶ 11.
[27] Doc. 15 at ¶ 12.
[28] Doc. 15 at ¶ 13.
[29] Doc. 15 at ¶ 14.

    d.  Costs of computer time;

    e.  Costs of hiring independent contractors and other temporary employees;

    f.  Costs of transportation, shipping or packaging;

    g.  Costs of warehouse or storage space; or

    h.  Costs of proper disposal of "your products," or products that contain "your products," that can not be reused, not exceeding your purchase price or your cost to produce the products.

In a section entitled "Breach of Warranty and Failure to Conform to Intended Purpose," the Product Withdrawal Endorsement excludes from coverage "product withdrawal expenses" arising out of "[a]ny 'product withdrawal' initiated due to the failure of 'your product' to accomplish their intended purpose, including any breach of warranty of fitness, whether written or implied.  This exclusion does not apply if such failure has caused or is reasonably expected to cause 'bodily injury' or physical damage to tangible property other than 'your product.'"[30]

The Product Withdrawal Endorsement also contains a section titled "Duties in the Event of a 'Defect' or a 'Product Withdrawal.'"[31]  The endorsement provides that "You must see to it that we are notified as soon as practicable of any actual, suspected or threatened 'defect' in 'your product.'"[32]  The endorsement further provides that "if a 'product withdrawal' is initiated, you must: (1) Immediately

---

[30] Doc. 15 at ¶ 15.
[31] Doc. 15 at ¶ 16.
[32] Doc. 15 at ¶ 17.

record the specifics of the 'product withdrawal' and the date it was initiated; and (2) Notify as us soon as practicable."[33]

### 2.      Pneu-Dart's Claim for Coverage

On July 29, 2016, General Star received an email from Pneu-Dart's insurance broker notifying General Star of a claim.  The email attached a July 28, 2016 letter from Pneu-Dart and an "Announcement From Pneu-Dart" dated April 27, 2016.[34]

In the July 28, 2016 letter, Blair Soars, Pneu-Dart's President, wrote: "We are writing today to notify you of a defect in our product which has resulted in product malfunction and the return, replacement, and disposal of a large volume of Remote Drug Delivery Devices (RDD's)."  Soars also wrote that the "defect was discovered in April of 2016 following customer reports of tail breakage" and that "[u]pon discovery and immediate correction to the crimper, we initiated an announcement to our customers encouraging them to test merchandise in their possession (announcement attached) prior to use."[35]

In a letter dated August 18, 2016, General Star reserved all rights under the Product Withdrawal Endorsement.  General Star cited the 15-16 Policy based on

---

[33]   Doc. 15 at ¶ 18.
[34]   Doc. 15 at ¶ 20.
[35]   Doc. 15 at ¶ 21.

Pneu-Dart's representation that its product withdrawal commenced in April 2016. General Star also requested documentation of Pneu-Dart's claimed expenses.[36]

Beginning on or about September 27, 2016 and thereafter, Pneu-Dart submitted expenses for reimbursement in connection with its claimed product withdrawal.[37]  By email dated October 20, 2016, General Star informed Pneu-Dart that, based on the information Pneu-Dart submitted, General Star would reimburse Pneu-Dart for the amount of $9,716.08. General Star then paid Pneu-Dart $9,716.08.[38]

In a letter dated November 30, 2016, Pneu-Dart asserted for the first time that its product withdrawal was initiated on January 30, 2015, not April 27, 2016 as initially reported.  Pneu-Dart claimed that it was therefore entitled to the full $100,000 limit of the Product Withdrawal Endorsement.[39]

In a letter dated January 4, 2017, General Star responded to Pneu-Dart. General Star again reserved rights under the Product Withdrawal Endorsement.[40] In its January 4 letter, General Star stated that, based on the information that Pneu-Dart provided, it had correctly analyzed the matter using an April 27, 2016 recall date. General Star further noted that, under the endorsement, it only would reimburse covered product withdrawal expenses that were both (a) incurred within

---

[36]   Doc. 15 at ¶ 22.
[37]   Doc. 15 at ¶ 23.
[38]   Doc. 15 at ¶ 24.
[39]   Doc. 15 at ¶ 25.
[40]   Doc. 15 at ¶ 26.

one year after the product withdrawal was initiated and (b) reported to General Star within one year of the date the expenses were incurred.[41]  On January 19, 2017, counsel for Pneu-Dart sent a letter to General Star contending that General Star had not correctly calculated reimbursement under the Product Withdrawal Endorsement.[42]

The parties and their counsel spoke by telephone on February 8, 2017.[43]  In advance of the February 8, 2017 call, counsel for General Star circulated two emails containing all of the expenses that Pneu-Dart had submitted for consideration.[44]  On February 15, 2017, Pneu-Dart submitted additional expense documentation.[45]

General Star sent Pneu-Dart a follow-up letter on February 24, 2017.[46]  In its February 24, 2017 letter, General Star again reserved rights under the Product Withdrawal Endorsement, including the right to dispute that a covered "product withdrawal" had occurred. General Star nevertheless expressed a willingness to resolve the claim given the amounts in dispute.[47]

General Star noted that, under the terms of the Product Withdrawal Endorsement, even if a "product withdrawal" were deemed to have been initiated

[41]  Doc. 15 at ¶ 27.
[42]  Doc. 15 at ¶ 28.
[43]  Doc. 15 at ¶ 29.
[44]  Doc. 15 at ¶ 30.
[45]  Doc. 15 at ¶ 31.
[46]  Doc. 15 at ¶ 32.
[47]  Doc. 15 at ¶ 33.

on January 30, 2015, reimbursable expenses would total $11,090.96, only $1,374.88 more than the $9,716.08 General Star already had paid.[48]  General Star offered to make the additional $1,374.88 payment.  However, it received no response from Pneu-Dart until Pneu-Dart filed the present action.[49]

## C.    Analysis

Per Pneu-Dart, "[t]he factual and legal issues raised by the Amended Counterclaim share complete identity with factual and legal issues which necessarily will be resolved through adjudication of the counts contained in the Complaint."  Pneu-Dart asserts that this compels dismissal because "General Star's Amended Counterclaim [is] redundant and serv[es] no useful purpose."[50]

The Court disagrees with Pneu-Dart.  First, as General Star notes, General Star's Amended Counterclaim contains new facts and new corroborating exhibits that are not found within the territory of Pneu-Dart's underlying Complaint.[51] Second, Pneu-Dart's underlying Complaint raises different legal issues than does General Star's Amended Counterclaim.  The Complaint asserts breach of contract and requests that the Court issue a declaratory judgment that Pneu-Dart is owed reimbursement under the 14-15 Policy.[52]  The Amended Counterclaim, by contrast,

---

[48]   Doc. 15 at ¶ 34.
[49]   Doc. 15 at ¶ 35.
[50]   Doc. 17 at 9.
[51]   *See* Doc. 24 at 4.
[52]   Doc. 1-1 at ¶¶ 27-39.

seeks four declaratory judgments, each of which requires the Court to interpret the insurance policies at issue here.[53]

"When specifically presented with a declaratory judgment counterclaim based on contract interpretation [such as here], courts are reluctant to dismiss such counterclaims as redundant even when such counterclaims are a 'mirror image' of the complaint."[54]  As I explained above, this case does not even reach the point of "mirror image" reproduction.  Based on the factual and legal differential between the Complaint and the Amended Counterclaim, as well as the general "reluctance to dismiss declaratory judgment counterclaims," I find that "resolution of [Pneu-Dart's] Complaint would not necessarily fully resolve [General Star's] interests as presented in [its] declaratory judgment counterclaim."[55]  Therefore, General Star's Amended Counterclaim may proceed.

## III.   CONCLUSION

Pneu-Dart's Motion to Dismiss pursuant to Rule 12(b)(6) is denied.  An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[53]  *See* Doc. 15 at Amended Counterclaim ¶¶ 36-60.
[54]  *Hunting v. Range Resources—Appalachia, LLC*, No. 4:16-CV-00864, 2016 WL 7034686, at *6 (M.D. Pa. Dec. 2, 2016) (Brann, J.).
[55]  *Id.*